

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

SHARON BURNETTE, PAMELA K. BURROUGHS, )
FRANK CARTER, JR., EDWARD CONQUEST, )
DONALD W. HOFFMAN, MONTY KING, )
LARRY MACON, MARVIN MCCLAIN, )
BENJAMIN PERDUE, JR., HENRY STUMP and )
BARBARA TABOR, )
suing on behalf of themselves and all others )
similarly situated, )
             )
        **Plaintiffs,** )  Civil Action No. 3:10cv070
             )
v. )
             )
HELEN F. FAHEY, in her capacity as Chair of the )
Virginia Parole Board; CAROL ANN SIEVERS, in her )
capacity as Vice-Chair of the Virginia Parole Board; and )
JACKIE T. STUMP, MICHAEL M. HAWES, and )
RUDOLPH C. MCCOLLUM, JR., in their capacity as )
Members of the Virginia Parole Board, )
             )
        **Defendants.** )

## CLASS ACTION COMPLAINT

Plaintiffs Sharon Burnette, Pamela K. Burroughs, Frank Carter, Jr., Edward
Conquest, Donald W. Hoffman, Monty King, Larry Macon, Marvin McClain, Benjamin Perdue,
Jr., Henry Stump and Barbara Tabor, by counsel, bring this class action on behalf of themselves
and all other similarly situated inmates and for their causes of action allege as follows:

## NATURE OF THE CASE

1.     This is a suit for declaratory and injunctive relief on behalf of a class of
inmates in Virginia's prisons whose constitutional rights are being violated by the practices,
policies and procedures of the Virginia Parole Board ("the Board"). Plaintiffs were convicted of
"violent" offenses committed prior to January 1, 1995, and have been legally eligible for parole

under Virginia law for eleven years or more. Plaintiffs are serving lengthy prison sentences that were imposed at a time when the expectations and assumptions of the courts, prosecutors and defense counsel were that Plaintiffs would receive fair and meaningful consideration for parole, as required by Virginia law, if they demonstrated themselves suitable for release once they became eligible for parole. These expectations and assumptions, however, were misplaced. In the years since enactment of Virginia Code § 53.1-165.1 abolishing parole for offenses committed on or after January 1, 1995, the Board has administered the parole process in a manner that eliminates any fair or meaningful consideration of parole for Plaintiffs, thus effectively abolishing parole retroactively even for offenses committed prior to January 1, 1995. Specifically, the Board has adopted and implemented practices, policies and procedures for making parole determinations without considering all the circumstances that Virginia law requires to be considered, resulting in a drastic reduction in the availability of parole for inmates convicted of violent offenses and the *de facto* abolition of the provisions of Virginia law governing parole for such inmates. Moreover, these practices, policies and procedures have created a significant risk of increasing the measure of punishment attached to such inmates' crimes at the time of sentencing. The Board's actions have violated due process and constitute an *ex post facto* enhancement of Plaintiffs' punishments, in violation of the United States Constitution.

## JURISDICTION AND VENUE

2.     This action arises under 42 U.S.C. § 1983 because it is a suit for declaratory and injunctive relief to address the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiffs by the Constitution of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391, because the Board's offices are located, and most or all of Defendants reside and may be found, in the Eastern District of Virginia, and a substantial part of the events or omissions giving rise to Plaintiffs' claims have occurred in the Eastern District of Virginia.

## THE PARTIES

### The Plaintiffs

4.     Plaintiff Sharon Burnette is a 49-year old prisoner in the custody of the Virginia Department of Corrections ("DOC") at Fluvanna Correctional Center for Women. She has been incarcerated for more than 28 years. She first became eligible for parole in 1994. By letter dated February 22, 2009, the Parole Board denied her parole for the twelfth time. On each occasion, the sole reason given for the denial has been "the serious nature and circumstances of the crime" or words to that effect.

5.     Plaintiff Pamela K. Burroughs is a 53-year old prisoner in the custody of the DOC at Virginia Correctional Facility for Women in Goochland. She has been incarcerated for more than 23 years. She first became eligible for parole in 1999. On December 16, 2009, the Parole Board denied her parole for the seventh time. With one exception, on each occasion the sole reason given for the denial has been "the serious nature and circumstances of the crime" or words to that effect. The exception occurred in 2006 when the denial included an additional reason – "involvement with drugs indicates disregard for the welfare of others." Burroughs has had no involvement with drugs during her incarceration.

6.     Plaintiff Frank Carter, Jr. is a 58-year old prisoner in the custody of the DOC at Coffeewood Correctional Center. He has been incarcerated for more than 32 years. He first became eligible for parole in 1986. By letter dated October 11, 2009, the Board denied him parole for the twenty-third time. With one exception, on each occasion the sole reason given for

3

the denial has been "the serious nature and circumstances of the crime" or words to that effect. The exception occurred in 1988 when the denial included an additional reason, "poor institutional conduct," which was likely a reference to a disciplinary charge he incurred for consensual conduct with his wife during a visit in 1987.

7.     Plaintiff Edward Conquest is a 54-year-old prisoner in the custody of the DOC at Greensville Correctional Center. He has been incarcerated for more than 34 years. He first became eligible for parole in 1988. By letter dated December 2, 2009, the Parole Board denied him parole for the twenty-second time. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

8.     Plaintiff Donald W. Hoffman is a 52-year-old prisoner in the custody of the DOC at Powhatan Correctional Center. He has been incarcerated for more than 31 years. He first became eligible for parole in 1991. By letter dated February 2, 2009, the Parole Board denied him parole for the fourteenth time. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

9.     Plaintiff Monty King is a 43-year-old prisoner in the custody of the DOC at Greensville Correctional Center. (Although King has obtained a court-approved change of his legal name, DOC refers to him by the name under which he entered DOC, Imond Monty Hicks.) King has been incarcerated for more than 23 years. He first became eligible for parole in 1999. By letter dated December 2, 2009, the Board denied him parole for the eighth time. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

10.     Plaintiff Larry Macon is a 53-year-old prisoner in the custody of the DOC at Greensville Correctional Center. He has been incarcerated for more than 33 years. He first became eligible for parole in 1990. By letter dated November 8, 2008, the Parole Board denied

him parole for the eighteenth time. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

11.    Plaintiff Marvin McClain is a 67-year old prisoner in the custody of the DOC at Keen Mountain Correctional Center. He has been incarcerated for more than 36 years. He first became eligible for parole in 1987. By letter dated November 4, 2008, the Parole Board denied him parole for the twenty-first time. On most occasions, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect. A few of the denials have included an additional reason -- "conviction of a new crime while incarcerated" or words to that effect. The only offense for which McClain has been convicted while incarcerated occurred more than thirty years ago and was for possession of contraband (a homemade knife).

12.    Plaintiff Benjamin Perdue is a 69-year old prisoner in the custody of the DOC at Augusta Correctional Center. He has been incarcerated for more than 25 years. He first became eligible for parole in 1996. By letter dated April 1, 2009, the Board denied him parole for the tenth time. On each occasion, the sole reason given has been "the serious nature and circumstances of the crime" or words to that effect.

13.    Plaintiff Henry Stump is a 48-year-old prisoner in the custody of the DOC at Powhatan Correctional Center. He has been incarcerated for more than 29 years. He first became eligible for parole in 1991. By letter dated April 23, 2009, the Parole Board denied him parole for the eighteenth time. On most occasions, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect. On a few occasions a second reason has been given – conviction of a new crime while incarcerated. In 1991, Stump pled guilty to possession of controlled substances for having a small amount of marijuana in 1989 and some unprescribed pills in 1990. This is Stump's only conviction while incarcerated.

14.     Plaintiff Barbara Tabor is a 67-year old prisoner in the custody of the DOC at the Virginia Correctional Center for Women in Goochland. She has been incarcerated for more than 28 years. She first became eligible for parole in 1993. By letter dated August 14, 2009, the Parole Board denied her parole for the eleventh time. On each occasion, the sole reason given for the denial has been "the serious nature and circumstances of the crime" or words to that effect.

### The Defendants

15.     Defendant Helen F. Fahey is the Chair of the Board. Fahey was appointed to the Board, as Chair, by Governor Mark R. Warner in January 2002. She has been acting as Chair of the Board continuously since that time, having been reappointed in January 2006. As Chair, Fahey is a full-time state employee.

16.     Defendant Carol Ann Sievers is the Vice-Chair of the Board. Sievers was appointed to the Board by Governor Warner in January 2002 and has been acting as a member of the Board continuously since that time. Sievers has been designated as a full-time state employee in her capacity as Vice Chair of the Board. She is the designated "representative of a crime victims' organization or a victim of crime" under Va. Code § 53.1-134.

17.     Defendant Jackie T. Stump is a member of the Board. Stump was appointed to the Board by Governor Warner in December 2005 and has been acting as a member of the Board continuously since that time. Stump has been designated as a full-time state employee in his capacity as a member of the Board.

18.     Defendant Michael M. Hawes is a member of the Board. Hawes was appointed by Governor Warner in March 2002 and has been acting as a member of the Board continuously since that time. Hawes is a part-time state employee in his capacity as a member of the Board.

6

19.     Defendant Rudolph C. McCollum, Jr. is a member of the Board. McCollum was appointed by Governor Timothy M. Kaine in February 2007 and has been acting as a member of the Board continuously since that time. McCollum is a part-time state employee in his capacity as a member of the Board.

## CLASS ACTION ALLEGATIONS

20.     The Plaintiffs bring this action on behalf of a class of persons currently incarcerated by the DOC for violent offenses committed prior to January 1, 1995, who are or will become eligible for parole, and who have been or are likely to be denied parole exclusively or primarily by reference to the "serious nature or circumstances of the crime" or words to that effect. For purposes of this Complaint, the term "violent offenses" is defined to include murder, rape, sodomy, robbery, assault, abduction, use of a weapon, and any other felony that the Board considers to be violent.

21.     As of the end of September, 2008, 6,377 parole-eligible inmates were incarcerated by DOC for violent offenses. Virginia Department of Corrections, Research, Evaluation and Forecast Unit, Research and Management Services, *Parole Eligible Inmates Incarcerated in the Virginia Department of Corrections as of September 2008*, at 3 (October, 2008). The vast majority of these inmates remain incarcerated and are therefore members of the proposed class. Joinder of them as parties is impractical because the class is so numerous and because all of the members of the proposed class are incarcerated and, upon information and belief, many of them are indigent and will most likely have great difficulty pursuing their constitutional claims individually.

22.     Questions of law and fact common to the proposed class include whether the Defendants' practices, policies and procedures for considering parole for those convicted of violent offenses violate the class members' rights to due process of law under the Fourteenth

7

Amendment to the United States Constitution, and whether such policies and procedures violate their rights to be free from *ex post facto* enhancement of their punishments under Article I, § 10, clause 1 of the United States Constitution.

23. The claims of the named Plaintiffs are typical of the claims of the proposed class and the named Plaintiffs will fairly and adequately represent the proposed class. The constitutional violations alleged by the named Plaintiffs stem from the same course of conduct by Defendants -- namely, Defendants' practices, policies and procedures that have had the intent and/or effect of denying fair and meaningful consideration for parole to parole-eligible prisoners convicted of violent offenses. The legal theories under which the named Plaintiffs seek relief are the same as those upon which the class will rely. In addition, the harm suffered by the named Plaintiffs is typical of the harm suffered by the proposed class members, to-wit, a significant risk of prolonged incarceration as a result of the Defendants' failure to provide a fair and meaningful consideration for parole conducted pursuant to the requirements of Virginia law.

24. The named Plaintiffs have the requisite personal interest in the outcome of this action in that each has been repeatedly denied parole because of the "serious nature and circumstances of the crime." Each plaintiff shares this interest with the class members and will fairly and adequately protect the interests of the class members.

25. The named Plaintiffs are represented by undersigned counsel. These attorneys have the resources, experience and expertise to diligently prosecute this class action and they have no knowledge of any conflicts among the members of the class or between any of the class members and counsel.

26. A class action is maintainable pursuant to Rule 23(b)(1) and/or Rule 23(b)(2) of the Federal Rules of Civil Procedure because the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with

respect to individual class members that would establish incompatible standards of conduct for Defendants, and Defendants have acted and will act on grounds applicable to all class members so that final declaratory and injunctive relief on behalf of all members is appropriate.

## STATEMENT OF THE CLAIMS

27.     Following Virginia's abolition of discretionary parole for offenses committed after 1994, the Board has adopted practices, policies and procedures that violate Virginia law and deprive Plaintiffs -- and the approximately 6,377 parole-eligible men and women imprisoned for violent offenses committed before January 1, 1995 -- of fair or meaningful consideration of parole. The Board's actions constitute a *de facto* abolition of the provisions of Virginia law governing parole, thus depriving Plaintiffs of liberty without due process of law. Moreover, the Board's actions have increased the punishment for Plaintiffs' crimes beyond the expectations and assumptions that the courts, prosecutors and defense counsel had at the time of sentencing and constitute an *ex post facto* enhancement of Plaintiffs' punishment in violation of the United States Constitution.

### Parole Requirements for Offenses Committed Prior to 1995

28.     For all inmates whose offenses were committed prior to January 1, 1995, and who otherwise meet the statutory eligibility requirements, Virginia law requires that the Parole Board consider a broad range of circumstances in determining whether an inmate is suitable for release on parole. Specifically, Virginia law *requires* that the Board "shall . . . [r]elease on parole" those "found suitable for parole," according to general rules to be adopted by the Board subject to approval of the Governor. Va. Code § 53.1-136. Virginia law also *requires* that the Board "shall review and decide" whether to release a parole-eligible inmate on parole at specific time intervals. Va. Code § 53.1-154. Virginia law further *requires* that the decision whether to grant parole must be premised on "a thorough investigation . . . into the prisoner's

9

history, physical and mental condition and character and his conduct, employment and attitude while in prison," and a determination in each individual case "that his release will not be incompatible with the interests of society or the prisoner." Va. Code § 53.1-155. These requirements apply to all Virginia inmates regardless of the nature of their offenses, *i.e.*, whether or not their offenses were violent.

29.     These requirements of Virginia law, which are sometimes referred to as "discretionary parole," are separate from the requirements in Va. Code § 53.1-159, sometimes referred to as "mandatory parole," which generally must be granted six months prior to an inmate's date of final release. As used in this Complaint, unless the context otherwise so indicates, the term "parole" refers to discretionary parole and not mandatory parole.

## Parole Practices and Procedures Prior to the Abolition of Parole

30.     In 1989, the parole grant rate in Virginia was 42%, *i.e.*, of those considered for parole, 42% were granted parole. Report of the Joint Legislative Audit and Review Commission ("JLARC") on Review of Virginia's Parole Process, Senate Doc. No. 4 (July 1991), at 20, 22 ("JLARC Report"). From 1990 to early 1993, the parole grant rate averaged over 41%. Virginia Department of Criminal Justice Services, Criminal Justice Research Center, *Crime in the Commonwealth* (Dec. 1999) at 55.

31.     Prior to the abolition of parole, Virginia judges, prosecutors and defense counsel were well aware of the availability of parole. The length of sentences imposed prior to the abolition of parole was based upon the universal expectation and assumption that Virginia law afforded a fair and meaningful opportunity for parole and that a prisoner who demonstrated an appropriate level of rehabilitation and suitability for release would not serve the full term or anything approaching the full term of his sentence. In 1993, for example, violent offenders in Virginia (as defined by the federal Violent Crime Control and Law Enforcement Act of 1994)

served only 38% of the imposed length of their sentences.  U.S. Department of Justice, Office of

Justice Programs, Bureau of Justice Statistics, *Trends in State Parole*, 1990-2000 (Oct. 2001)

at 6.

      32.    As a result of the universal expectations and assumptions that Virginia law

afforded a fair and meaningful opportunity for parole, Plaintiffs and members of the class -- even

those who were first time offenders -- were given lengthier sentences than they otherwise would

have received to ensure that they would serve an adequate period of time prior to being released

on parole.

### The Abolition of Parole for Offenses Committed After 1994

      33.    In 1994, Virginia abolished parole for all inmates who committed offenses

on or after January 1, 1995.  Va. Code § 53.1-165.1.  For such inmates, Virginia law now

generally requires incarceration for the full length of their sentences, subject to reduction by up

to 15% through earned sentence credits, Va. Code § 53.1-202.3, and subject further to being

paroled six months prior to their date of final release.  Va. Code § 53.1-159.

      34.    Although the General Assembly considered proposals to abolish parole

retroactively, it did not do so because it recognized that to do so would violate the United States

and Virginia Constitutions.  In September 1994, Attorney General James Gilmore issued an

opinion to a member of the Virginia House of Delegates that, because Virginia had established a

system of parole, considerations of due process required that parole procedures be fundamentally

fair and that existing inmates be considered fairly for parole release.  1994 Report of the

Attorney General 88, 90, *citing Franklin v. Shields,* 569 F.2d 800 (4th Cir.) (en banc), *cert.*

*denied,* 435 U.S. 1003 (1978).  In his opinion, Attorney General Gilmore further stated that any

regulation that had the effect of abolishing parole for currently incarcerated inmates would

violate the *Ex Post Facto* Clauses of the United States and Virginia Constitutions.  He concluded

that *"parole may not be abolished retroactively in Virginia, either by statute or by administrative action."* *Id.* at 92-93 (emphasis added).

35.     Consistent with Attorney General Gilmore's September 1994 opinion, the Virginia Commission on Sentencing and Parole Reform reported -- "regrettably" -- that it appeared from "case law" that "the benefits and limitations of the existing parole system must ... remain available for those inmates currently serving time in the prison system." Report of the Commission on Sentencing and Parole Reform to the Governor and the General Assembly of Virginia, House Doc. No. 18 (1995) at 10-11.

### Board Practices, Policies and Procedures Following the Abolition of Parole

36.     Although the existing parole system could not be abolished retroactively "by statute or by administrative action," beginning in 1995 the Board began to adopt and implement practices, policies and procedures that had the intent and/or effect of abolishing parole retroactively for Plaintiffs and the members of the class.

37.     For example, prior to the abolition of parole in 1995, the Board had introduced a set of Parole Guidelines that contained a risk assessment tool to be used and relied upon in making parole determinations. Risk assessment tools are well recognized by corrections experts to be useful in assessing suitability of release and are used by parole authorities in the vast majority of jurisdictions in the United States. Indeed, Virginia law currently requires the Virginia Criminal Sentencing Commission to use a risk assessment instrument to inform its sentencing guidelines for offenses committed *after* 1994. Va. Code § 17.1-803(5). Nevertheless, after the abolition of parole, the Board discontinued use of the risk assessment tool contained in the Parole Guidelines. *See* Letter from Helen F. Fahey to Keith W. DeBlasio, December 12, 2005, at 1.

38.     Similarly, Virginia law requires the Board to establish general rules governing the granting of parole. Va. Code § 53.1-136.1. Such rules were previously published in the Virginia Administrative Code. 14 Va. Reg. No. 17 at 2457 (Apr. 22, 1998). In 1998, the Board repealed those rules and has never replaced them, in violation of Virginia law. Instead of replacing its rules, the Board has relied on a "Policy Manual." This Manual states that the Board's parole decisions are "guided" by 14 factors, only one of which relates to the nature of the offense for which the inmate was incarcerated. The other factors include considerations relating to rehabilitation and the level of risk to society and the prisoner if the prisoner were to be released on parole, as required by Virginia law. Va. Code § 53.1-155.

39.     Despite the purported "guidance" of the 14 factors in its "Policy Manual," the Board has relied primarily, if not exclusively, on the "serious nature and circumstances of the crime" when making parole determinations with regard to inmates convicted of violent offenses. The Board has not given fair or meaningful consideration to the other factors in its Policy Manual when making such determinations. The Board's reliance on the "serious nature and circumstances of the crime" has resulted in virtually automatic and repeated denials of parole for inmates convicted of violent offenses, even when the other factors in the Manual and the statute would favor release.

40.     The Board's disregard of its obligation to provide fair and meaningful consideration for parole, and its *de facto* abolition of the provisions of Virginia law governing parole for Plaintiffs and the members of the class, are further evidenced by its failure to adopt and maintain policies and procedures for obtaining information relating to all the statutory factors applicable to parole decisions and therefore likely to produce informed predictions about suitability of release on parole.

41.    In the past, the Board, like the paroling authority in most other states, conducted face-to-face personal interviews of inmates to inform its decisions. The Board has abandoned this practice. It relies instead on pro forma interviews by a small number of parole examiners, in some cases solely by video, which often last for only a few minutes, and frequently focus primarily on the nature of the offense for which the inmate has been incarcerated. These interviews often do not seek or obtain any information relevant to many of the other factors identified in the Board's Policy Manual or required by Virginia law.

42.    The Board does not regularly meet with its parole examiners to discuss their reports. On information and belief, the parole examiners instead submit their reports to an electronic data base which the members of the Board may then access electronically.  The reports of the parole examiners do not carry any significant weight in the decisions of the Board concerning inmates convicted of violent offenses. Similarly, the Board does not solicit information from prison wardens, guards, counselors, psychologists, and other DOC employees who see and work with Plaintiffs and members of the class on a day-to-day basis and could provide probative information concerning their suitability for release. In fact, the Board has affirmatively discouraged the provision of such information.

43.    The Board no longer regularly meets at its offices in Richmond and Board members no longer regularly exchange views about candidates for parole. Instead, the Board's regular practice is to circulate an electronic file to each Board member on a seriatim basis so that members can vote electronically to grant or deny parole.

44.    While Virginia law generally requires that inmates eligible for parole be considered annually, the Board may elect to defer subsequent consideration of parole by up to three years for inmates with at least ten years remaining on their sentence. Va. Code § 53.1-154. The Board has made use of such three-year deferrals in a completely arbitrary manner.  For

14

example, it has issued to inmates over the course of their incarceration alternating three-year deferrals and one-year denials with no apparent basis for the distinctions.

45.     In 2002, the Board changed its rules to reduce the frequency with which inmates' families and representatives may schedule meetings with a member of the Board to no more frequently than once every two years. Virginia Parole Board Administrative Procedure 1.112. In contrast, the Board diligently endeavors to contact the victim prior to any decision to grant parole, and to permit the victim to present oral or written testimony to the Board. Va. Code § 53.1-155.B. Likewise, the Board's regular practice is to schedule meetings with inmates' family members with only one of five Board members, whereas no such limitation applies to meetings with the families and representatives of victims. *Id.* at 2.

46.     The procedures established by the Board following the abolition of parole have enabled the Board to make decisions about whether to grant or deny parole exclusively or primarily on the basis of the nature of the offense with no fair or meaningful consideration of the other factors relating to suitability for release required to be considered under Virginia law. In addition, the Board's procedures have rendered its decision-making process opaque and have made it difficult if not impossible for anyone to hold the Board accountable for its decisions denying parole.

### The Results of the Board's Actions Following the Abolition of Parole

47.     By fiscal year 1996, the parole grant rate in Virginia had dropped to 18% for all offenders, *i.e.*, including non-violent offenders. By fiscal year 2000, this figure had dropped to 8%, and by fiscal year 2008 it had dropped to less than 5%. Letter from Wayne M. Turnage to Delegate Kenneth C. Alexander, Jan. 23, 2009 (Chart) ("Turnage Letter Chart"). For inmates convicted of violent offenses, parole has been rendered even less likely by the Board's actions since the abolition of parole in 1994. From fiscal year 2002 through fiscal year 2008, the

parole grant rate for inmates convicted of violent offenses ranged from no higher than 3.7% to as low as 2.1%.

48.     Of the small number of inmates granted parole by the Board after 1994, many had already served more than 85% of the time before their mandatory parole release date. For example, in June 2008, six of the eight granted parole (which was only 5% of 161 inmates considered for discretionary parole in 2008) were already within one year of their mandatory release date. *See* www.vadoc.state.va.us/resources/vpb/decisions/ default.shtm.

49.     Defendants have repeatedly defended the Board's low parole grant rate by asserting that most parole-eligible inmates have committed violent offenses, without referring to the other factors set forth in Va. Code § 53.1-155 and in the Board's own Policy Manual.

50.     In 2009, a representative of the Governor of Virginia (who by statute appoints the members of the Parole Board and approves the Board's rules governing the granting of parole and eligibility requirements, Va. Code §§ 53.1-134, 53.1-136(1)) advised members of the General Assembly that "the current low parole grant rate is a consequence of the high proportion of violent offenders" under review by the Board. Turnage Letter at 2. In fact, as of September 2008, the percentage of inmates eligible for parole who had committed violent offenses was 77.5%. *See* Virginia Department of Corrections, Research, Evaluation and Forecast Unit, Research and Management Services, *Parole Eligible Inmates Incarcerated in the Virginia Department of Corrections as of September 2008*, October 2008, at 3. By comparison, in 1994, when the parole grant rate was over 40%, the percentage of DOC inmates convicted of violent offenses was 69.1%, thus belying any significant difference in the proportion of violent offenders under review after the abolition of parole.

51.     For inmates who have committed violent offenses, the Board has replaced fair and meaningful consideration for parole with repeated denials based primarily if not

exclusively on the violent nature of their offenses, regardless of the other factors required to be considered by Virginia law.

52.    In fiscal years 2006 and 2007, the Board gave only a single reason for approximately 45% of all of its denials of parole -- the "serious nature and circumstances of crime" or words to that effect. *See* Letter from Helen F. Fahey to The Honorable Linda T. Puller, Feb. 7, 2008. In each of these instances, the Board cited no facts specific to the circumstances of the individual inmates and referred to no other factors required to be considered by Virginia law. On information and belief, virtually all of these denials involved inmates convicted of violent offenses.

53.    The Plaintiffs have received the "serious nature and circumstances of crime" "explanation" for their denials of parole repeatedly year in and year out -- even as long as 30 years or more after the time of the offense -- even when the crime was a first time offense committed at a very young age -- even in the face of undisputed evidence of model conduct during decades of incarceration -- and even when detailed and reliable release plans make the likelihood of recidivism extremely unlikely.

54.    What is more, Plaintiffs and the members of the class have been repeatedly denied parole despite their advanced age. As a general rule, the older an inmate is, the smaller the risk that the inmate will commit another offense if released on parole. Virginia Criminal Sentencing Commission, *Report on Parole-Eligible and Geriatric Inmates in State Correctional Facilities* (Sept. 1, 2009) ("VCSC 2009 Report") at 22. As of the end of 2008, 1,357 DOC inmates eligible for parole were 50 years old or older, and 379 of such inmates were 60 years old or older. *Id.* at 12. These numbers are expected to grow in future years. Nevertheless, the Defendants repeatedly have denied parole to such aging and elderly inmates, often with no explanation other than "serious nature and circumstances of crime" and even

17

though in every case the crime was committed prior to 1995 (at least 15 years ago and in many cases much earlier). In November 2009, for example, 145 of 373 inmates denied parole were 50 years old or older and 38 such inmates were 60 years old or older. *See* www.vadoc.state.va.us/resources/vpb/decisions/default.shtm.

55.     The Board's reliance on the "serious nature and circumstances of the crime" as the primary or sole reason to deny parole, without regard to other factors relating to suitability for release, is also reflected in the Board's geriatric release policy. Virginia law requires the Board to consider petitions for geriatric release from prisoners aged 60 or older who have served at least ten years, and from prisoners aged 65 or older who have served at least five years. Va. Code § 53.1-40.01. This law was amended in 2001 specifically to include inmates whose offenses were committed prior to the abolition of parole. Such inmates comprise approximately 80% of those who currently qualify to file such petitions. VCSC 2009 Report at 23. Many of these inmates are confined to wheelchairs, diagnosed with diabetes or other crippling diseases, or living in assisted living facilities.

56.     The Board's written policy is to grant a geriatric release only for "compelling reasons." Virginia Parole Board Administrative Procedure 1.226. The Board has granted only seven geriatric release petitions since the geriatric release statute took effect in 1995. Virginia Criminal Sentencing Commission 2008 Annual Report at 91. The Board has stated that its low grant rate for such petitions is "mainly because of the nature of the offenses of those that applied." Geriatric Offenders Report at 9. For 95% of the offenders denied geriatric release, the Board has cited the serious nature of the original offense. Virginia Criminal Sentencing Commission 2008 Annual Report at 91.

57.     Defendants' practices and policies following the abolition of parole have substantially extended the median time served by inmates eligible for parole. For example,

during fiscal years 1988 through 1992, the median sentence for inmates convicted of first degree

murder without any prior violent offense was 12.4 years.  Virginia Criminal Sentencing

Commission 2005 Annual Report at 47.  Plaintiffs and the members of the class convicted of

murder without any prior violent offense have all already served substantially more than 12.4

years.

58.     For offenses committed after 1994, Virginia has established sentencing

guidelines pursuant to Virginia Code §§ 17.1-803, 17.1-805.  One of the purposes of the

sentencing guidelines has been to require those convicted of violent offenses to serve

substantially longer prison terms than they would have served prior to the abolition of parole.

Under these guidelines, the median sentence for those convicted of murder without any prior

violent offense has been increased to 31.9 years.  Virginia Criminal Sentencing Commission

*2005 Annual Report* at 47.

59.     On information and belief, Defendants have relied at least in part on these

sentencing guidelines in making determinations whether to grant or deny parole to Plaintiffs and

the members of the class, even though the guidelines are supposed to apply only to offenses

committed after 1994.  Moreover, some members of the class have been imprisoned even longer

than the high end of the sentences recommended under the guidelines.  For example, by the end

of 2008, more than 700 inmates still eligible for parole had already served longer than the high

end of the sentences recommended under the guidelines for the same or similar offenses.  VCSC

2009 Report at 17.

### Consideration of Plaintiffs for Parole

60.     Each of the Plaintiffs has repeatedly been denied parole solely or primarily

by reference to the "serious nature and circumstances of the crime" or words to that effect.  All

the Plaintiffs have demonstrated through their conduct, employment and attitude while in prison

that they have been rehabilitated and would pose no meaningful risk to public safety if they were to be released on parole. Each of the Plaintiffs has an outstanding institutional record, marked by positive evaluations, one or more educational degrees, vocational certifications, positive work experience, and satisfactory completion of reentry and other programs made available by DOC. Each of the Plaintiffs has a solid release plan, including a place to live and reasonable prospects for employment.

61.     Plaintiff Sharon Burnette committed her offense in 1981 at the age of 21. She pled guilty to murder and use of a firearm in connection with the killing of a gas station attendant during a robbery. She was sentenced to life plus one year. Her only prior conviction was for a misdemeanor for shoplifting. At the time of her sentencing, her lawyer told her that if she stayed out of trouble and made good progress while in prison, she would probably be paroled by the time she was 34 or 35 years old.

a.     Burnette is now 49 years old and has served more than 28 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

b.     Burnette has had only one institutional infraction in 28 years -- a 1982 charge for failure to stand for count when she was sleeping.

c.     Burnette's employers and counselors have confirmed that she is "able to cope with good and bad situations; gets along with various personalities; is strong, kind, intelligent, a good worker; highly proficient in attitude and work habits; [and displays] exceptional institutional conduct."

d.     Notwithstanding her record, Burnette has been denied parole twelve times, with two of the denials occurring after three year deferrals of consideration for

parole. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

62.     Plaintiff Pamela K. Burroughs committed her offense in 1985 at age 28. She had no prior criminal conviction, other than for trespassing after returning to a trailer to collect her belongings following an eviction. She pled guilty to murder of a robbery victim, who was killed by her two co-defendants during the course of the robbery. At the time of her offense, she was addicted to and a heavy user of methamphetamines. She was sentenced to life for murder, 30 years for robbery (with sentence suspended), and five years (pursuant to a separate indictment) for distribution of PCP (to run concurrently). When sentencing her, the Frederick County Circuit Court judge told her that with a good prison record he expected that she would be granted parole after her first or second review.

a.     Burroughs is now 53 years old and has served more than 23 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates who had not committed any prior violent offenses.

b.     Burroughs has satisfactorily completed DOC's substance abuse course, is neither addicted to nor uses alcohol or drugs, and has repeatedly been tested as drug-free.

c.     Burroughs has had only one institutional infraction, which was for sleeping through count more than fourteen years ago.

d.     Burroughs has completed her GED and has successfully completed numerous courses offered through J. Sergeant Reynolds Community College. She has also successfully completed many vocational programs while in prison, leading to certifications as Horticulture-Specialty Grower, Sales Person-Horticulture, Floral Designer, Data Entry Clerk and Word Processor Operator.

     e.     Burroughs' record is replete with commendations for her trustworthiness and diligence in the prison community. As early as 2002, a counselor attended her annual interview with the parole examiner, recommended a grant of parole and advised the examiner that there was nothing to be gained from her continued incarceration. In 2009, her Case Management Counselor, citing her demonstrated dedication to self-improvement and self enhancement, declared his "support [for] Ms. Burroughs in her efforts to obtain her release."

     f.     Notwithstanding her record, Burroughs has been denied parole seven times, with two of the denials occurring after three year deferrals of consideration for parole. Except as noted in paragraph 5 of this Complaint, on each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

     63.     Plaintiff Frank Carter, Jr. committed his offenses in 1976 at age 26. He shot and killed his former girlfriend and her boyfriend after a party at which all had been drinking heavily. He received a sentence of 80 years. His only prior criminal record consisted of a number of misdemeanors and a juvenile offense for which he spent a year in a juvenile facility at age 12. He had no prior felony convictions.

     a.     Carter is now 58 years old and has served 32 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates who had not committed any prior violent offenses.

     b.     Carter has had no institutional infractions since 1987 when he was charged with consensual conduct with his wife during a visit.

     c.     Carter has a long and accomplished employment history while in prison. Since July 2003, he has worked at the auto starter rebuilding factory at Coffeewood Correctional Center. In a 2008 review, the Plant Manager praised Carter's work: "He is highly

skilled...[and] maintains a strong work ethic....If a conflict or production problem arises, he attempts to resolve it quickly using tact and effective communication." During the early years of his incarceration, he did farm work for which he was allowed outside the prison gate unescorted. He also participated in the Community Involvement Group (CIG) where he worked outside at various shelters in Richmond.

        d.     Notwithstanding his record, Carter has been denied parole twenty-three times. Except as noted in paragraph 6 of this Complaint, on each occasion the sole reason given for the denial has been "serious nature and circumstances of the crime" or words to that effect.

        64.     Plaintiff Edward Conquest committed his offenses in 1975 at age 19. He was convicted of first degree murder for the killing of the driver of a dry cleaners van in the course of a robbery. He was sentenced to two life terms, one for the killing and one for the robbery. He had no prior juvenile or adult criminal record, and had never previously been arrested.

        a.     Conquest is now 54 years old and has served more than 34 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

        b.     Conquest has had no institutional infraction since 1989, when he was cited for disobeying a direct order.

        c.     Conquest's most recent available annual review form states that he "continues to maintain an overall exemplary adjustment."

        d.     While incarcerated, Conquest has received his GED certification as well as small business management and associate degrees from a community college. In

addition, prior to suspension of the Pell grant program, he completed all but 16 credit hours required for a bachelor's degree.

   e. While in prison Conquest has worked in recreational programs, a furniture factory, and as a teacher's aide and has received "exceptional" and "exemplary" employment reviews. As early as 1995, his supervisor stated that Conquest "would be a good candidate for future parole consideration." Other DOC officers have told him that they have recommended him for parole, and have expressed surprise when learning of his denials.

   f. Notwithstanding his record, Conquest has been denied parole twenty-two times. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

   65. Plaintiff Donald W. Hoffman committed his offense in 1978 at age 20. He pled guilty to first degree murder following the commission of rape by a co-defendant and received a life sentence. He was not convicted of the rape and recent DNA testing has eliminated him as a participant in the rape. His co-defendant was convicted of the rape, received a lesser sentence and was released upon completion of his sentence. Hoffman's only prior criminal record consisted of a simple assault conviction while a juvenile and an assault charge at age 18 that was dismissed upon an accord and satisfaction.

   a. During his 31 years of incarceration, Hoffman has been charged with only one disciplinary infraction. That occurred in 2002 when he was charged with consensual conduct with his wife during a visit.

   b. Hoffman is now 52 years old and has served more than 31 years.

   c. Hoffman has consistently received outstanding scores on his annual review forms and on his job performance reviews.

        d.     While incarcerated, Hoffman has successfully completed many educational and self-improvement programs and courses, including an Associate in Applied Science Degree from J. Sargeant Reynolds Community College, numerous computer courses, sex offender courses and The Breaking Barriers Program.

        e.     As early as 1991, a DOC employee recommended Hoffman for parole. The former Buildings and Grounds Superintendent for the Department of Correctional Enterprises has stated that "I don't know of anyone who deserves a second chance more than Mr. Hoffman."

        f.     Notwithstanding his record, Hoffman has been denied parole fourteen times, with three of the denials occurring after two year deferrals, and one of the denials after a three year deferral, of consideration for parole. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

        66.     Plaintiff Monty King committed his offenses in 1986 at age 19. He had no prior juvenile or adult record or arrest. He pled guilty and was sentenced to life for felony murder, and seven years for robbery, based on evidence that, while under the influence of alcohol and PCP, he beat up an elderly woman while stealing her car in a parking garage. He used no weapons, but she later died from the beating. One week later, plaintiff King unsuccessfully attempted a similar car robbery (also while under the influence of drugs). He pled guilty to that offense, and received an additional sentence of five years for attempted robbery.

        a.     King is now 43 years old and has served more than 23 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no record of prior violent offenses.

25

b.      King has satisfactorily completed DOC's substance abuse course and is neither addicted to nor uses alcohol or drugs, as confirmed by repeated DOC-administered testing.

c.      King has had no institutional infractions of any kind since 1994, when he was charged with sleeping through count.

d.      King has an outstanding institutional and employment record while in prison. In addition, while in prison he has completed a two year Associates in General Studies program through Paul D. Camp Community College.

e.      King has located and reunited with his birth mother, who was forced to give him up for adoption when he was seven years old and who has committed to housing him and employing him in her family business.

f.      Notwithstanding his record, King has been denied parole seven times, with two of the denials occurring after three year deferrals of consideration for parole. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

67.     Plaintiff Larry Macon committed his two offenses in 1976 at age 19. He was convicted of robbery for taking a pocketbook from a woman on the street while pretending to carry a gun, and for a subsequent murder of the owner of stereo equipment who had returned to his home during the course of Macon's effort to steal the equipment. He was sentenced to life for the murder and nine years for the earlier robbery. Aside from three minor offenses as a juvenile and a gambling offense as an adult, none of which involved violence, Macon had no prior adult or juvenile record.

a.      Macon is now 53 years old and has served more than 33 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no record of prior violent offenses.

b.      Macon has had only a few minor institutional infractions in 33 years, the last in 2006 for telling a DOC employee he was attracted to her.

c.      While incarcerated, Macon has received his GED certification and he successfully completed numerous college classes before suspension of the Pell grant program. He has also completed courses in upholstery, brick masonry, printing, plumbing, and furniture repair, and has been fully employed first as a baker and now as a painter.

d.      Macon's counselors have told him that they have supported him for parole. On information and belief, this view is shared by every other DOC employee in his building who knows him.

e.      Notwithstanding his record, Macon has been denied parole eighteen times, with one of the denials occurring after a two year deferral of consideration for parole. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

68.      Plaintiff Marvin McClain pled guilty to murder and robbery in 1973 at age 29. The victim was a storekeeper who was shot and killed by a co-defendant during the course of the robbery of a convenience store. His only prior record consists of two juvenile offenses (breaking and entering and receiving stolen goods).

a.      McClain is now 67 years old and has served more than 36 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates who had not committed any prior violent offenses.

b.     During his imprisonment, McClain has incurred only six minor disciplinary infractions.

c.     McClain earned his GED during his early years of imprisonment and has since served as a charter member in a number of programs, including an elderly and youth program, anger management, breaking barriers and drug and alcohol programming.

d.     McClain has acquired skills in computer programming, brick masonry, drafting, plumbing, offset printing, auto mechanics and water treatment. He is an accomplished jewelry craftsperson and, throughout his years at Brunswick, served as a mentor to younger prisoners and as a teacher of jewelry-making.

e.     During the mid-1980s, McClain was allowed outside for unsupervised duties at James River and Powhatan Correctional Centers. While at Augusta Correctional Center, he worked in the institutional administrative offices around staff workers on a daily basis.

f.     McClain's former counselors at Augusta and Deerfield have all told him he should be released, and as early as 1990 one of them recommended his release.

g.     Notwithstanding this record, McClain has been denied parole twenty-one times. Except as noted in paragraph 11 of this Complaint, on each occasion the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

69.     Plaintiff Benjamin Perdue, Jr. committed his offenses in 1983 at age 42. He pled guilty to the malicious wounding of his former wife and the murder of her parents (and associated firearms violations) committed during the course of a contested divorce proceeding and while Perdue was intoxicated. He was sentenced to two life terms plus 21 years to run concurrently. He had no prior criminal convictions.

a.      Perdue is now 69 years old and has served more than 25 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no record of prior violent offenses.

b.      Perdue was a high school graduate at the time of his convictions and has completed 42 college credits while incarcerated. He has completed multiple and extensive programming in substance abuse and anger management and has been alcohol-free for 25 years.

c.      Perdue has never had an institutional infraction and has been commended on two occasions for exemplary action in reporting possible security breaches to correctional officers.

d.      Perdue started the "Programs Assisting Youth" program at Bland Correctional Center and for ten years spoke to teens about his alcoholism, his regrets, and the hardships of imprisonment. He was commended by Warden Pattie Huffman for his initiative and commitment to the program. Perdue has facilitated the Breaking Barriers program and has been described as an "excellent worker" who "exceeds any work assigned."

e.      The psychiatrist who found Perdue competent to stand trial has written on his behalf to the Parole Board several times and on one occasion told the Board that, if prison is about rehabilitation, Perdue had been rehabilitated.

f.      Notwithstanding this record, Perdue has been denied parole ten times. On each occasion, the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

70.     Plaintiff Henry Stump committed his offense in 1980 at age 19. He pled guilty to murder for the killing of a bootlegger from whom he and a co-defendant were purchasing liquor. He was sentenced to a term of 93 years. (His co-defendant received a lesser

sentence and was released on parole in 1990.) His only prior record consisted of a conviction for auto theft while a juvenile and charges of public intoxication.

        a.     Stump is now 48 years old and has served more than 29 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

        b.     Since 1991, Stump has had only two disciplinary infractions – one for possession of dice in 1991 and one for possession of an extra pair of reading glasses in 2008.

        c.     Stump has consistently received outstanding scores on his annual review forms and on his job performance reviews.

        d.     While incarcerated, Stump has successfully completed a GED program as well as a large number of educational and self-improvement courses offered by DOC.

        e.     On Stump's 2007 annual review form, his counselor wrote that he "has taken just about every program offered for self improvement since entering corrections."

        f.     Notwithstanding his record, Stump has been denied parole eighteen times, with one of the denials occurring after a two year deferral of consideration for parole. Except as noted in paragraph 13 of this Complaint, on each occasion the sole reason given for the denial has been the "serious nature and circumstances of the crime" or words to that effect.

        71.     Plaintiff Barbara Tabor was convicted of felony murder in 1981 in connection with a robbery planned for a time the victim was not expected to be at home. Tabor was not present during the robbery, in which her co-defendant shot and killed the homeowner. She was sentenced to a term of life plus twenty one years. Her only prior criminal record was a

conviction for transportation of stolen property for which she was sentenced to three years of probation.

        a.     Tabor is now 67 years old and has served more than 28 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

        b.     During her incarceration, Tabor has been charged with just three minor disciplinary infractions, and only one (visiting without permission with an inmate) during the last ten years.

        c.     Tabor has completed her GED and other courses while in prison and has a successful prison employment record, first in the laundry (as the only mechanic) and currently in the enterprise microfilm shop, where she has been entrusted with microfilming confidential medical and criminal records for the entire Virginia DOC prison system.

        d.     Tabor's prison employers praise her work and her record includes a statement from her counselor that she is "a good parole risk."

        e.     Notwithstanding her record, Tabor has been denied parole eleven times, with two of the denials occurring after three year deferrals of consideration for parole.  On each occasion, the sole reason given for the denial has been "serious nature and circumstances of the crime."

### The Effects of the Board's Practices, Policies and Procedures

        72.     Defendants' practices, policies and procedures have failed to produce informed predictions about Plaintiffs' suitability for release, have deprived Plaintiffs of information about what they need to do to improve their chances for parole, have denied Plaintiffs fair and meaningful opportunity for parole, and have created a significant risk of prolonging Plaintiffs' incarceration for far longer than contemplated by Virginia law and far

longer than the courts, prosecutors and defense attorneys expected or assumed when the sentences were handed down. For Plaintiffs and the members of the class, this has amounted to a *de facto* abolition of the provisions of Virginia law governing parole.

73. The Board's unlawful policies and procedures have imposed, and unless enjoined will continue to impose, irreparable injuries upon Plaintiffs, the members of the proposed class, and their family members. Remedying these unlawful policies and procedures would serve the public interest by ensuring (a) fair and meaningful consideration for parole in accordance with the requirements of Virginia law and the United States Constitution, (b) the availability to Virginia and other states of the productive services of men and women suitable for release on parole, (c) realization of the tax revenues associated with the services of such men and women, (d) the family support that such men and women would be in a position to provide, and (e) the savings of potentially hundreds of millions of dollars in operating and prison construction costs associated with the unwarranted continued incarceration of Plaintiffs and the members of the class.

## COUNT I
### (Violation of Due Process)

74. Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 - 73 above.

75. As a result of the foregoing policies and procedures, the Board's consideration of parole with respect to Plaintiffs and members of the class has been and will continue to be arbitrary and capricious. The Board's conduct constitutes a failure (a) to make informed decisions about suitability for release, (b) to exercise discretion, and (c) to give fair and meaningful consideration of parole. The Board's conduct violates the rights of Plaintiffs and the members of the class to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT II
### (*Ex Post Facto* Violation)

76.     Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 - 75 above.

77.     The conduct of the Board constitutes an *ex post facto* enhancement of the punishments imposed upon the named Plaintiffs and members of the class at their respective sentencings in violation of Article I, § 10, cl. 1 of the United States Constitution.

### Prayer for Relief

WHEREFORE, Plaintiffs ask this Court to:

A.     certify a class as defined in this Complaint;

B.     issue an order adjudging and declaring that the policies, practices and procedures of the Parole Board following the abolition of parole for offenses committed after 1994 deprive Plaintiffs and the members of the class of fair and meaningful consideration for parole as required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

C.     issue an order adjudging and declaring that such policies, practices and procedures violate the rights of Plaintiffs and the members of the class guaranteed under Article I, § 10, cl. 1 of the United States Constitution;

D.     enjoin and restrain the Defendants and all those in concert or participation with them from conducting parole reviews without according Plaintiffs and members of the proposed class fair and meaningful consideration of parole, including consideration of each of the factors required by Virginia law and reflected in the Board's own Policy Manual;

E.     order the Defendants to make immediate determinations concerning parole for Plaintiffs and the members of the class in accordance with the mandates of this Court;

F.    order the Defendants to promulgate, after reasonable notice and opportunity for public comment, rules governing parole reviews and determinations that comport with the mandates of this Court and publish such rules in the Virginia Administrative Code;

G.    award Plaintiffs the costs and disbursements of this action;

H.    award Plaintiffs reasonable attorney's fees; and

I.    grant Plaintiffs such further and other relief as to this Court may seem just and proper.

Dated:  February 3, 2010          SHARON BURNETTE, PAMELA K. BURROUGHS,
                                  FRANK CARTER, JR., EDWARD CONQUEST,
                                  DONALD W. HOFFMAN, MONTY KING,
                                  LARRY MACON, MARVIN MCCLAIN,
                                  BENJAMIN PERDUE, JR., HENRY STUMP and
                                  BARBARA TABOR, suing on behalf of themselves
                                  and all others similarly situated

                                  By _____
                                              Of counsel

Stephen A. Northup, VSB No. 16547
Robert A. Angle, VSB No. 37691
TROUTMAN SANDERS LLP
Post Office Box 1122
Richmond, Virginia  23218-1122
(804) 697-1240
(804) 698-5120 (fax)

Alex R. Gulotta, VSB No. 37097
Abigail Turner, VSB No. 74437
Gail Starling Marshall, VSB No. 7737
LEGAL AID JUSTICE CENTER
100 Preston Avenue
Charlottesville, Virginia  22903
(434) 977-0553

William R. Richardson, Jr., VSB No. 16139
2674 Marcey Road
Arlington, Virginia 22207
(703) 447-8328

        Counsel for Plaintiffs