IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



SHARON BURNETTE,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:10CV70

HELEN F. FAHEY,
et al.,

     Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the Defendants' MOTION TO DISMISS (Docket No. 3). For the reasons set forth below, the motion will be granted.

## I. BACKGROUND

This action was filed by eleven inmates who are prisoners with the Virginia Department of Corrections ("DOC"). The Complaint alleges that Defendants, who are members of the Virginia Parole Board ("the Board"), violated the Plaintiffs' constitutional rights with respect to discretionary parole. The two claims are summarized below.

In Count I, the Plaintiffs contend that:

> the Board has adopted practices that violate Virginia law and deprive Plaintiffs -- and the approximately 6,377 parole-eligible men and women imprisoned for violent offenses committed before January 1, 1995 -- of fair or meaningful consideration of parole. The Board's actions constitute a _de facto_

> abolition of the provisions of Virginia law
> governing parole, thus depriving Plaintiffs of
> liberty without due process of law."

(Compl. ¶ 27.)  In Count II, the Plaintiffs contend that:

> [The] Board's actions have increased the
> punishment for Plaintiffs' crimes beyond the
> expectations and assumptions that the courts,
> prosecutors and defense counsel had at the
> time of sentencing and constitute an ex post
> facto enhancement of Plaintiffs' punishment in
> violation of the United States Constitution.

(Compl. ¶ 27.)

Plaintiffs also seek to have the action certified as a class action on behalf of parole eligible inmates who have been convicted of violent offenses.  Defendants have moved to dismiss the action under Fed. R. Civ. P. 12(b)(6).  Following briefing and argument, the motion is ripe for disposition.

## II.  SUMMARY OF ALLEGATIONS

The allegations of the Complaint are to be taken as true and any reasonable inference is to be to the Plaintiffs.  The allegations are summarized with that principle in mind.

In 1994, the Virginia General Assembly abolished parole for all offenses committed after January 1, 1995.  (Compl. ¶ 33.) Plaintiffs committed the offenses of which they were convicted before January 1, 1995.  Thus, they are eligible to be considered for parole.  Nevertheless, the Board repeatedly has denied each Plaintiff parole based on the serious nature and circumstances of their crimes.

2

## A. The Individual Plaintiffs

It is alleged that:

> Each of the Plaintiffs has an outstanding
> institutional record, marked by positive
> evaluations, one or more educational degrees,
> vocational certifications, positive work
> experience, and satisfactory completion of
> reentry and other programs made available by
> [the] DOC. Each of the Plaintiffs has a solid
> release plan, including a place to live and
> reasonable prospects for employment.

(Compl. ¶ 60.) The pertinent allegations respecting each

plaintiff are set forth below.

### 1. Sharon Burnette

> Plaintiff Sharon Burnette committed her
> offense in 1981 at the age of 21. She pled
> guilty to murder and use of a firearm in
> connection with the killing of a gas station
> attendant during a robbery. She was sentenced
> to life plus one year. Her only prior
> conviction was for a misdemeanor for
> shoplifting. . . .
> Burnette is now 49 years old and has
> served more than 28 years, which is well in
> excess of the median for first degree murder
> served prior to the abolition of parole by
> inmates with no prior violent offenses. . . .
> . . . .
> Notwithstanding her [excellent
> institutional] record, Burnette has been
> denied parole twelve times, with two of the
> denials occurring after three year deferrals
> of consideration for parole. On each occasion,
> the sole reason given for the denial has been
> the "serious nature and circumstances of the
> crime" or words to that effect.

(Compl. ¶ 61.)[1]

---

[1] The recitation of the allegations cites only to the
pertinent paragraph in the Complaint. There are no citations to

3

### 2. Pamela K. Burroughs

Plaintiff Pamela K. Burroughs committed her offense in 1985 at age 28. She had no prior criminal conviction, other than for trespassing after returning to a trailer to collect her belongings following an eviction. She pled guilty to murder of a robbery victim, who was killed by her two co-defendants during the course of the robbery. At the time of her offense, she was addicted to and a heavy user of methamphetamines. She was sentenced to life for murder, 30 years for robbery (with sentence suspended), and five years (pursuant to a separate indictment) for distribution of PCP (to run concurrently). When sentencing her, the Frederick County Circuit Court judge told her that with a good prison record he expected that she would be granted parole after her first or second review.

Burroughs is now 53 years old and has served more than 23 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates who had not committed any prior violent offenses.

(Compl. ¶ 62.)[2]

### 3. Frank Carter Jr.

Plaintiff Frank Carter, Jr. committed his offenses in 1976 at age 26. He shot and killed his former girlfriend and her boyfriend after a party at which all had been drinking heavily. He received a sentence of 80 years. His only prior criminal record consisted of a number of misdemeanors and a juvenile offense for which he spent a year in a juvenile facility at age 12. He had no prior felony convictions.

---

subparagraphs.

[2] In 2006, the Board also denied Burroughs parole for the additional reason of "involvement with drugs indicates disregard for the welfare of others." (Compl. ¶ 5.)

Carter is now 58 years old and has served 32 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates who had not committed any prior violent offenses.

(Compl. ¶ 63.)

### 4. Edward Conquest

Plaintiff Edward Conquest committed his offenses in 1975 at age 19. He was convicted of first degree murder for the killing of the driver of a dry cleaners van in the course of a robbery. He was sentenced to two life terms, one for the killing and one for the robbery. He had no prior juvenile or adult criminal record, and had never previously been arrested.

Conquest is now 54 years old and has served more than 34 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

(Compl. ¶ 64.)

### 5. Donald W. Hoffman

Plaintiff Donald W. Hoffman committed his offense in 1978 at age 20. He pled guilty to first degree murder following the commission of rape by a co-defendant and received a life sentence. He was not convicted of the rape and recent DNA testing has eliminated him as a participant in the rape. His co-defendant was convicted of the rape, received a lesser sentence and was released upon completion of his sentence. Hoffman's only prior criminal record consisted of a simple assault conviction while a juvenile and an assault charge at age 18 that was dismissed upon an accord and satisfaction.

During his 31 years of incarceration, Hoffman has been charged with only one disciplinary infraction. That occurred in 2002 when he was charged with consensual conduct with his wife during a visit.

5

Hoffman is now 52 years old and has served more than 31 years.

(Compl. ¶ 65.)

### 6. Monty King

Plaintiff Monty King committed his offenses in 1986 at age 19. He had no prior juvenile or adult record or arrest. He pled guilty and was sentenced to life for felony murder, and seven years for robbery, based on evidence that, while under the influence of alcohol and PCP, he beat up an elderly woman while stealing her car in a parking garage. He used no weapons, but she later died from the beating. One week later, plaintiff King unsuccessfully attempted a similar car robbery (also while under the influence of drugs). He pled guilty to that offense, and received an additional sentence of five years for attempted robbery.

King is now 43 years old and has served more than 23 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no record of prior violent offenses.

(Compl. ¶ 66.)

### 7. Larry Macon

Plaintiff Larry Macon committed his two offenses in 1976 at age 19. He was convicted of robbery for taking a pocketbook from a woman on the street while pretending to carry a gun, and for a subsequent murder of the owner of stereo equipment who had returned to his home during the course of Macon's effort to steal the equipment. He was sentenced to life for the murder and nine years for the earlier robbery. Aside from three minor offenses as a juvenile and a gambling offense as an adult, none of which involved violence, Macon had no prior adult or juvenile record.

Macon is now 53 years old and has served more than 33 years, which is well in excess of the median for first degree murder served

prior to the abolition of parole by inmates with no record of prior violent offenses.

(Compl. ¶ 67.)

### 8.   Marvin McClain

Plaintiff Marvin McClain pled guilty to murder and robbery in 1973 at age 29. The victim was a storekeeper who was shot and killed by a co-defendant during the course of the robbery of a convenience store. His only prior record consists of two juvenile offenses (breaking and entering and receiving stolen goods).

McClain is now 67 years old and has served more than 36 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates who had not committed any prior violent offenses.

(Compl. ¶ 68.)

### 9.   Benjamin Perdue, Jr.

Plaintiff Benjamin Perdue, Jr. committed his offenses in 1983 at age 42.   He pled guilty to the malicious wounding of his former wife and the murder of her parents (and associated firearms violations) committed during the course of a contested divorce proceeding and while Perdue was intoxicated. He was sentenced to two life terms plus 21 years to run concurrently. He had no prior criminal convictions.

Perdue is now 69 years old and has served more than 25 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no record of prior violent offenses.

(Compl. ¶ 69.)

### 10.  Henry Stump

Plaintiff   Henry   Stump   committed   his

7

offense in 1980 at age 19. He pled guilty to murder for the killing of a bootlegger from whom he and a co-defendant were purchasing liquor. He was sentenced to a term of 93 years. (His co-defendant received a lesser sentence and was released on parole in 1990.) His only prior record consisted of a conviction for auto theft while a juvenile and charges of public intoxication.

Stump is now 48 years old and has served more than 29 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

(Compl. ¶ 70.)

### 11. Barbara Tabor

Plaintiff Barbara Tabor was convicted of felony murder in 1981 in connection with a robbery planned for a time the victim was not expected to be at home. Tabor was not present during the robbery, in which her co-defendant shot and killed the homeowner. She was sentenced to a term of life plus twenty one years. Her only prior criminal record was a conviction for transportation of stolen property for which she was sentenced to three years of probation.

Tabor is now 67 years old and has served more than 28 years, which is well in excess of the median for first degree murder served prior to the abolition of parole by inmates with no prior violent offenses.

(Compl. ¶ 71.)

### B. Statistics with Respect to Parole Release

Much of the Complaint is addressed to statistical information about parole in Virginia. The statistical information is set forth below as alleged.

"The length of sentences imposed prior to the abolition of parole was based upon the universal expectation and assumption that

8

Virginia law afforded a fair and meaningful opportunity for parole and that a prisoner who demonstrated an appropriate level of rehabilitation and suitability for release would not serve the full term or anything approaching the full term of his sentence." (Compl. ¶ 31.)

"From 1990 to early 1993, the parole grant rate [for all offenders] averaged over 41%." (Compl. ¶ 30.) "By fiscal year 1996, the parole grant rate in Virginia had dropped to 18% for all offenders, i.e., including non-violent offenders. By fiscal year 2000, this figure had dropped to 8%, and by fiscal year 2008 it had dropped to less than 5%." (Compl. ¶ 47.)

"As of the end of September, 2008, 6,377 parole-eligible inmates were incarcerated by DOC for violent offenses." (Compl. ¶ 21.)[3] "From fiscal year 2002 through fiscal year 2008, the parole grant rate for inmates convicted of violent offenses ranged from no higher than 3.7% to as low as 2.1%." (Compl. ¶ 47.)

"In 2009, a representative of the Governor of Virginia (who by statute appoints the members of the Parole Board and approves the Board's rules governing the granting of parole and eligibility requirements . . . advised members of the General Assembly that 'the current low parole grant rate is a consequence of the high proportion of violent offenders' under review by the Board.'" (Compl. ¶ 50.) "In fact, as of September 2008, the percentage of

---

[3] Based on the numbers provided in the Complaint, there are a total of 8,228 parole eligible inmates within the DOC. Of those inmates, 1,851 inmates are incarcerated for non-violent offenses.

9

inmates eligible for parole who had committed violent offenses was 77.5%." (Compl. ¶ 50.) "By comparison, in 1994, when the parole grant rate was over 40%, the percentage of DOC inmates convicted of violent offenses was 69.1%, thus belying any significant difference in the proportion of violent offenders under review after the abolition of parole." (Compl. ¶ 50.)

"In fiscal years 2006 and 2007, the Board gave only a single reason for approximately 45% of all of its denials of parole -- the 'serious nature and circumstances of crime' or words to that effect." (Compl. ¶ 52.)

"Defendants' practices and policies following the abolition of parole have substantially extended the median time served by inmates eligible for parole. For example, during fiscal years 1988 through 1992, the median sentence for inmates convicted of first degree murder without any prior violent offense was 12.4 years. . . . Plaintiffs and the members of the class convicted of murder without any prior violent offense have all already served substantially more than 12.4 years." (Compl. ¶ 57.)

C.    **Changes with Respect to Parole Practices and Procedures**

Defendants have eliminated the Board's use of a risk assessment tool, which was used prior to 1995. (Compl. ¶ 37.) Additionally, section 53.1-136.1 of the Virginia Code requires the Board to "[a]dopt, subject to approval by the Governor, general rules governing the granting of parole and eligibility requirements, which shall be published and posted for public

10

review." Those rules were previously published in the Virginia Administrative Code. 14 Va. Reg. No. 17 at 2457 (Apr. 22, 1998). In 1998, the Board repealed those rules and replaced them with a published "Policy Manual." The Policy Manual states that the Board's parole decisions are "guided" by 14 factors, only one of which relates to the nature of the offense for which the inmate was incarcerated. (Compl. ¶ 38.)

With respect to Virginia's geriatric release statute, Defendants require candidates for geriatric release (who are all age 60 or older) to demonstrate "compelling reasons" for release. (Compl. ¶ 56.)

Defendants have abandoned personal Board interviews of parole candidates. Defendants have replaced Board interviews with parole examiner reports. The interviews by the parole examiners frequently focus on the offense for which the inmate is incarcerated and do not address other factors regarding the inmates suitability for parole. Defendants do not solicit information from prison wardens or staff about the suitability for release of the inmates under their care. (Compl. ¶¶ 41-42.)

Defendants have eliminated regular consultations among Board members about candidates for parole, and they no longer regularly meet in the Board's Richmond office. (Compl. ¶ 43.)

According to Plaintiffs, Defendants have arbitrarily used three-year deferrals of parole review. (Compl. ¶ 44.) Defendants

have reduced the limited opportunities for the inmate's family members to meet with members of the Board. (Compl. ¶ 45.)

### III.   STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).   In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.   This principle only applies to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).[4]

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is

---

[4]   For example, Plaintiffs' allegation that Defendants "arbitrarily" use three parole deferrals of parole is a conclusion, rather than a statement of fact.   (Compl. ¶ 44.)

entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (second alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). That standard is not satisfied by complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 550 U.S. at 555 (citations omitted). Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," id. (citation omitted), stating a claim that is "plausible on its face," id. at 570, rather than merely "conceivable." Id.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Bell Atl. Corp., 550 U.S. at 556). Thus, a plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002)). Furthermore, "the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009)

(quoting Iqbal, 129 S. Ct. at 1952 ). "Without such heft, the plaintiff's claims cannot establish a valid entitlement to relief, as facts that are merely consistent with a defendant's liability, fail to nudge claims across the line from conceivable to plausible." Id. (internal citations and quotation marks omitted).

## IV. DUE PROCESS ANALYSIS

The Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569-70 (1972). Thus, the first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected liberty or property interest. Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997) (citing cases). Where government action impacts a protected liberty interest, the second step is to determine "what process is due" under the circumstances. Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (observing that "due process is flexible . . . . not all situations calling for procedural safeguards call for the same kind of procedure").

### A. The Constitution Itself Does Not Confer a Protected Liberty Interest in Parole Release or Parole Consideration[5]

---

[5] It is necessary to distinguish between parole release and consideration for parole. Although Plaintiffs do not argue that they have a protected interest in parole release, they insist that they have a protected liberty interest in "fair consideration" for parole release and Defendants have denied them due process with respect to this right.

A liberty interest may arise from the Constitution itself, or from state laws and policies. Wilkinson v. Austin, 545 U.S. 209, 220-21 (2005). "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979). "With no constitutional right to parole per se, federal courts recognize due process rights in an inmate only where the state has created a 'legitimate claim of entitlement' to some aspect of parole." Vann v. Angelone, 73 F.3d 519, 522 (4th Cir. 1996) (quoting Gaston v. Taylor, 946 F.2d 340, 344 (4th Cir. 1991) (en banc)).

**B.    Virginia Law Does Not Create a Protected Liberty Interest in Parole Release**

"A liberty interest protected by the Fourteenth Amendment must amount to more than an abstract need or desire, or a unilateral hope." Gaston, 946 F.2d at 344 (citation omitted). State laws create a liberty interest only when the statute's language "'plac[es] substantive limitations on official discretion.'" Slezak v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994) (quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983)). The United States Court of Appeals for the Fourth Circuit explained the fairly exacting nature of this requirement in Slezak as follows:

> [C]onstitutionally protected liberty interests
> are only created by state law regimes which in
> the end effectively say to inmates: "If facts

15

> A, B, and C are established in an appropriate
> fact-finding process, you are thereupon
> legally entitled to a more favorable . . .
> classification than you presently have," or,
> "Unless facts A, B, and C are so established,
> you are legally entitled not to be placed in a
> less favorable classification than you now
> have."

Id. at 595.

Here, the pertinent statute with respect to parole release
requires the Board to deny parole unless certain requirements are
met:

> No person shall be released on parole by the
> Board until a thorough investigation has been
> made into the prisoner's history, physical and
> mental condition and character and his
> conduct, employment and attitude while in
> prison. The Board shall also determine that
> his release on parole will not be incompatible
> with the interests of society or of the
> prisoner.

Va. Code Ann. § 53.1-155 (Michie 1986).[6] Contrary to the
Plaintiffs' view (e.g. Compl. 28), "the pertinent [Virginia]
statutes, far from creating a presumption that release will be
granted . . . absolutely prohibits parole unless the Parole Board

---

[6] The prior version of this statute is almost identical:

No person shall be released on parole by the Board until
it has made, or caused to be made, a thorough
investigation as to the history, the physical, and mental
condition, and the character of the prisoner and his
conduct, employment and attitude while in prison, nor
until the Board has determined that his release on parole
will be compatible with the interests of the prisoner and
of society.

Va. Code Ann. § 53-253 (Michie Repl. Vol. 1974).

16

decides otherwise." James v. Robinson, 863 F. Supp. 275, 277 (E.D. Va.) (internal quotation marks omitted), aff'd, No. 94-7136, 1994 WL 709646 (4th Cir. Dec. 22, 1994). "The Fourth Circuit has examined the [statutory] language and repeatedly held that it does not create a liberty interest in parole release." Neal v. Fahey, No. 3:07cv00374, 2008 WL 728892, at *2 (E.D. Va. Mar. 18, 2008) (citing Hill v. Jackson, 64 F.3d 163, 170-71 (4th Cir. 1995); Gaston, 946 F.2d at 344).

## C. Plaintiffs Have a Limited Interest in Consideration for Parole

Plaintiffs may enjoy "some constitutionally protected interest at least in parole 'consideration' subject to due process." Hill, 64 F.3d at 170. This limited interest derives from mandatory statutory language requiring that "the Board shall review and decide the case of each prisoner no later than that part of the calendar year in which he becomes eligible for parole, and at least annually thereafter, until he is released on parole or discharged" unless the Board determines that certain criteria exist. Va. Code Ann. § 53.1-154 (Michie 1993). "Because the inmates here have no liberty interest in parole release under Virginia law, neither can they have any liberty interest in the underlying procedures governing parole determination, so long as the procedures themselves satisfy due process." Hill, 64 F.3d at 171. "The question thus becomes what procedures are required under the Due

Process Clause in [considering] an inmate for discretionary release on parole." Neal, 2008 WL 728892, at *2.

**D.  The Complaint Pleads that the Plaintiffs Have Been Afforded Sufficient Process With Respect to Plaintiffs' Limited Liberty Interest in Consideration for Parole.**

Addressing the process that is due in respect of consideration for release on parole, the Fourth Circuit has held that "inmates are entitled to no more than minimal procedure." Vann, 73 F.3d at 522. "At most . . . parole authorities must 'furnish to the prisoner a statement of its reasons for denial of parole.'" Id. (quoting Franklin v. Shields, 569 F.2d 784, 801 (4th Cir. 1997) (en banc); citing Bloodgood v. Garraghty, 783 F.2d 470, 473 (4th Cir. 1986)).[7]  So long as the statement provides a valid ground for denying parole, the federal courts cannot, under the guise of due process, demand more from the state. See Bloodgood, 783 F.2d at 475 ("[W]here the denial of parole . . . rests on one constitutionally valid ground, the Board's consideration of an allegedly invalid ground would not violate a constitutional right." (citing Zant v. Stephens, 462 U.S. 862 (1983)). In Bloodgood, the

---

[7]  The Fourth Circuit also remarked that there is "no constitutional requirement that each prisoner receive a personal hearing, have access to his files, or be entitled to call witnesses in his behalf to appear before the Board.  These are all matters which are better left to the discretion of the parole authorities." Franklin, 569 F.2d at 800.  In support of their position, Plaintiffs cite to the panel decision in Franklin. (Pls.' Mem. in Opp'n to Mot. to Dismiss 4.)  The Fourth Circuit, sitting en banc, largely rejected the panel's conclusions.  See Franklin, 569 F.2d at 800-01.

Fourth Circuit concluded that the parole board gave constitutionally sufficient reasons when it informed the prisoner that he was denied parole release because of "the seriousness of [his] crime" and his "pattern of criminal conduct." Id. at 472, 474. Thereafter, the Fourth Circuit repeatedly has concluded that "seriousness nature and circumstances" of prisoner's offense is a constitutionally valid reason for denying parole. See Brown v. Johnson, 169 F. App'x 155, 157 (4th Cir. 2006) (No. 05-7496), available at 2006 WL 460912, at *2; Davis v. Jackson, No. 94-6121, 1995 WL 761034, at *1 (4th Cir. Dec. 27, 1995).

Here, the Complaint reflects that the Board has provided each Plaintiff with a constitutionally valid reason for denying them release on discretionary parole. Therefore, the face of the Complaint alleges facts establishing that each Plaintiff has received the process that is required with respect to the limited liberty interest in consideration for parole.

**E.   Plaintiffs Have No Constitutional Right to the Additional Process They Demand.**

Plaintiffs contend that the foregoing analysis "overlooks[s] the key due process right on which the Complaint is based, i.e., the right to a system that is 'fundamentally fair' and includes 'fair' and 'meaningful' consideration of all of the factors that Virginia law requires to be taken into account when making parole determinations regarding parole-eligible inmates." (Pl.'s Mem. in Opp'n to Mot. to Dismiss 4-5.)

19

The pertinent precedent show that an inmate may state a due process claim with respect to his limited liberty interest in consideration for parole if the Board denied parole solely upon an irrelevant or invalid factor. See Bloodgood, 783 F.2d at 475. However, contrary to Plaintiffs' insistence, by creating a system of discretionary parole, Virginia did not bind itself to the continued use of any particular procedures in evaluating Plaintiffs for parole. Neal, 2008 WL 728892, at *2 ("The limited liberty interest in parole consideration does not imbue with constitutional significance every procedure that the Parole Board may have employed in evaluating him for parole." (citing Hill, 64 F.3d at 170)). "[A]lthough the inmates may have some interest in parole consideration generally, it is clear that there is no 'protected liberty interest in the procedures themselves, only in the subject matter to which they are directed.'" Hill 64 F.3d at 170 (gouting Ewell v. Murray, 11 F.3d 482, 488 (4th Cir. 1993)).

Plaintiffs' argument that they were denied a right to a "fundamentally fair" parole consideration is little more than an attempt to "federalize-indeed, constitutionalize-every deviation from state procedures." Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 649 (D.C. Cir. 1987) (rejecting inmate's claims that he had been denied his right to meaningful parole review hearing). As noted by the Fourth Circuit in rejecting a similar argument:

> Process only assumes significance in a
> context. The notion that naked process itself
> takes on constitutional dimensions has most
> troublesome implications. Courts have
> explicitly and repeatedly rejected the
> proposition that an individual has an interest
> in a state-created procedural device, such as
> a hearing, that is entitled to constitutional
> due process protection . . . . Process is not
> an end in itself. Its constitutional purpose
> is to protect a substantive interest to which
> the individual has a legitimate claim of
> entitlement . . . . The mere fact that the
> government has established certain procedures
> does not mean that the procedures thereby
> become substantive liberty interests entitled
> to federal constitutional protection under the
> Due Process Clause. . . . Such state
> procedural requirements must be enforced in
> state courts under state law.

Hill, 64 F.3d at 171 (alterations and omissions in original;
internal quotation marks omitted) (quoting Brandon, 823 F.2d at 648-
49).

Plaintiffs' argument that they were denied their due process
rights by the Board's alleged failure to consider specific factors
listed in the statutes in considering them for parole is likewise
flawed. First, as explained above, the alleged deviation involves
at most a state procedural requirement that would be required to be
enforced in the Virginia courts, under Virginia law. Id.; Riccio
v. County of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) ("If
state law grants more procedural rights than the Constitution would
otherwise require, a state's failure to abide by that law is not a
federal due process issue."). Second, as discussed below,
Plaintiffs' own submissions reflect that the Board continues to

21

consider the other factors listed in statute in evaluating them and other violent inmates for parole.

   **F.    The Factual Allegations of the Complaint Do Not Plausibly Suggest that the Board Has Effectively Abolished Parole for Plaintiffs or Other Violent Offenders Who Committed Their Offense Prior to January 1, 1995.**

While Plaintiffs contend that, for violent offenders, the Board does not consider any factors other than the violent nature of the offense in determining the suitability of their release on parole, the allegations in Complaint are not consistent with this conclusion.[8]   Specifically, Plaintiffs state that, "[i]n fiscal years 2006 and 2007, the Board gave only a single reason for approximately 45% of all of its denials of parole -- the 'serious nature and circumstances of crime' or words to that effect." (Compl. ¶ 52.)   Of course, that allegation per force acknowledges that, in 55% of all denials of parole, the Board considered and denied parole based upon factors others than to "the serious nature and circumstances" of an inmate's offense.   Given that violent offenders make up 77.5% of  the parole eligible inmates, it appears that, even for violent offenders, the Board regularly considers factors other than the nature of the offense in evaluating them for parole.

_____

   [8] For example, Plaintiff Burroughs alleges that subsequent to 1995, the Board has considered  factors in addition to her murder conviction in denying her release on parole.  Specifically, in 2006 the Board denied Burroughs parole based the additional reason that her preincarceration "involvement with drugs indicates disregard for the welfare of others."   (Compl. ¶ 5.)

Plaintiffs insist that the rate at which violent offenders are paroled reflects that, the Board "has eliminated fair and meaningful consideration of parole for inmates convicted of violent offenses." (Pls.' Mem. in Opp'n to Mot. to Dismiss 5.) That inference is compatible neither with commonsense nor basic mathematics. Before 1995, there continued to be an influx of new parole eligible inmates into the DOC. After 1995, the pool of inmates eligible for parole was closed. Because, in each year, the Board paroled those inmates most suitable for release, each succeeding year the Board would be considering a smaller pool of applicants who, because of the seriousness of their crimes and other relevant factors, were less suitable for release on parole.

Further, the Complaint reflects that the Board continues to release on parole roughly between 120 to slightly more 230 violent offenders per year. Those figures, of course, show that the Board continues to consider for release on parole violent offenders such as Plaintiffs. Under those circumstances, it is logical that the rate at which inmates are paroled would decrease over time for reasons other than unfairness.

Although Plaintiffs may believe that Defendants should give greater weight to their rehabilitation and less weight to their serious crimes, neither the pertinent statues nor the Due Process Clause requires them to do so. Plaintiffs cite Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) and Biggs v. Terhune, 334 F.3d 910,

917 (9th Cir. 2003) for the proposition that continued reliance on

an unchanging factor, such as the circumstances of the offense, to

deny parole because at some point is unfair, and violates due

process principles. The United States Court of Appeals for the

Ninth Circuit recently has overruled those cases holding that:

> These decisions may be read to mean that a
> parole-eligible prisoner has a constitutional
> right to be released unless there is "some
> evidence" of future dangerousness. If there is
> any right to release on parole, or to release
> in the absence of some evidence of future
> dangerousness, it has to arise from
> substantive state law creating a right to
> release. To the extent our prior decisions
> including Biggs v. Terhune, . . . Irons v.
> Carey, and our panel decision in this case
> might be read to imply that there is a federal
> constitutional right regardless of whether
> state law entitles the prisoner to release, we
> reject that reading and overrule those
> decisions to the extent they may be read to
> mean that.

Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010).

For the foregoing reasons, Count I, alleging violations of

due process, fails the sufficiency standards set by Twombly and

Iqbal.

## V. EX POST FACTO ANALYSIS

In Count II, the Complaint alleges that the "conduct of the

Board constitutes an ex post facto enhancement of the punishments

imposed upon the named Plaintiffs and members of the class at

their respective sentencings in violation of Article I, § 10, cl.

1 of the United States Constitution." (Compl. ¶ 77) This count also is legally insufficient and must be dismissed.

The United States Constitution prohibits federal and state governments from passing any ex post facto law. U.S. Const. art. I, § 9, cl. 3; id. art. I, § 10, cl. 1. An ex post facto law "'makes more burdensome the punishment for a crime, after its commission.'" Collins v. Youngblood, 497 U.S. 37, 42 (1990) (quoting Beazell v. Ohio, 269 U.S. 167, 169-70 (1925)). Changes to parole laws that create "a sufficient risk of increasing the measure of punishment attached to the covered crimes" violate the Ex Post Facto clause. Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995). That said, "[a]s the constitutional text makes clear, the ex post facto prohibition applies to 'laws.'" Warren v. Baskerville, 233 F.3d 204, 207 (4th Cir. 2000) (citing United States v. Ellen, 961 F.2d 462, 465 (4th Cir. 1992); Prater v. U.S. Parole Comm'n, 802 F.2d 948, 951 (7th Cir. 1986)). "A change in an administrative policy that was in effect at the time of a criminal's underlying offenses does not run afoul of the prohibition against ex post facto laws." Id. (citing Ellen, 961 F.2d at 465).

The Supreme Court has found that a retroactively applied change to a parole regulation or guideline may violate the Ex Post Facto Clause if it "creates a significant risk of prolonging [an inmate's] incarceration." Garner v. Jones, 529 U.S. 244, 251

(2000). Nevertheless, "the Fourth Circuit has interpreted Garner to apply only to parole regulations that are legislative rules rather than merely changes in 'an administrative policy that was in effect at the time of a criminal's underlying offenses.'" Lyons v. U.S. Parole Comm'n, No. 3:08cv342, 2009 WL 211583, at *3 (E.D. Va. Jan. 28, 2009) (quoting Warren, 233 F.3d at 2007).[9] In rejecting the plaintiffs' ex post facto claim in Warren, the Fourth Circuit observed that "the Virginia Parole Board made a policy decision that was within the parameters of existing state law. If the States are to have any freedom in developing optimal parole systems, they must be able to make policy adjustments

---

[9] A legislative rule "has the force of law, and creates new law or imposes new rights or duties." Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n, 874 F.2d 205, 207-08 (4th Cir. 1989) (citing cases). Legislative rules stand in contrast with interpretive rules, which do not implicate the Ex Post Facto Clause. Ellen, 961 F.2d at 465-66. "'[I]nterpretive rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties.'" Id. at 465(alteration in original) (quoting Jerri's Ceramic Arts, Inc., 874 F.2d at 207). "Unlike legislative rules . . . interpretative rules are statements of enforcement policy. They are . . . merely guides, and not laws: guides may be discarded where circumstances require; laws may not." Id. at 4 (internal quotations omitted; second omission in original). For example, the Supreme Court has concluded that the federal Sentencing Guidelines "are the equivalent of legislative rules adopted by federal agencies." Stinson v. United States, 562 U.S. 36, 44 (1993); see also, United States v. Morris, 562 F.3d 1131, 1135 (10th Cir. 2009). Thus, changes to the Sentencing Guidelines are subject to review under the Ex Post Facto Clause. United States v. Lewis, 606 F.3d 193, 203 (4th Cir. 2010) (concluding that "given the importance our precedent places on the proper calculation of the advisory Guidelines range," the Ex Post Facto Clause precluded the application of a newer version of the Sentencing Guidelines that might increase a defendant's sentence).

26

without raising the specter of constitutional litigation."
<u>Warren</u>, 233 F.3d at 208 (<u>citing</u> <u>Garner</u>, 529 U.S. at 252; <u>Roller v.</u>
<u>Gunn</u>, 107 F.3d 227, 237 (4th Cir. 1997)); <u>see also</u> <u>Vann</u>, 73 F.3d
at 521 ("It is difficult to imagine a context more deserving of
federal deference than state parole decisions.").

Plaintiffs contend that Defendants have violated the
prohibition against ex post facto laws because they "have replaced
the exercise of discretionary judgment required under [section
53.1-155 of the Virginia Code] with their own scheme in which
violent offenders are automatically denied parole solely because
of their crimes, without any consideration of the other parole
factors specified by Virginia law." (Pls.' Surreply Mem. 6.) As
explained previously, this claim fails as a factual implausibility
because the complaint refutes the notion that such a scheme or
policy exists because it alleges that the Defendants continue to
exercise their discretion and release on parole roughly 120 to 230
violent offenders per year.

Additionally, Plaintiffs' ex post facto claim fails because
the Plaintiffs have not tied their allegations about an increased
risk of punishment to the implementation a particular rule or
regulation. <u>See</u> <u>Foster v. Booker</u>, 595 F.3d 353, 362-63 (6th Cir.
2010) (emphasizing an ex post facto claim alleging increased risk
of punishment must be linked to "some legal change other than a
difference in the proper exercise of discretion"). At best, the

27

Complaint indicates there has been a decrease in the rate at which inmates are released on parole. Plaintiffs fail to allege facts that plausibly suggest that any significant risk of longer incarceration is attributable to the implementation of a new law, rather than the Board's legitimate exercise of its discretion. Id.

> If the Parole Board decided within its discretion to get tougher, that could hardly amount to an ex post facto violation as long as it was within the Parole Board's discretion to get tougher. This would be true . . . even if the Board members independently developed a tougher attitude, and even if the Board members partook of a general public attitude that parole decisions should be tougher.

Id. at 362.

For the foregoing reasons, Count II is legally insufficient under Twombly and Iqbal. Therefore, the MOTION TO DISMISS (Docket No. 3) will be dismissed. The dismissal of the Complaint as legally insufficient necessitates that the PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT LIMITED DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE (Docket No. 15) will be denied and John R. Lay's MOTION/PETITION FOR JOINDER AS PARTY PETITIONER(S)/PLAINTIFF(S) (Docket No. 8) will be denied. The action will be dismissed.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: _October 25, 2010_

28